COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.
2-06-088-CR

 

 

ALBERTO MARTINEZ                                                           APPELLANT

 

                                                   V.

 

THE STATE OF TEXAS                                                                STATE

 

                                              ------------

 

           FROM
THE 372ND DISTRICT COURT OF TARRANT COUNTY

 

                                              ------------

 

                                             OPINION

 

                                              ------------

                                          I.  Introduction








Appellant Alberto Martinez
appeals his conviction and twenty-five-year sentence for possessing 400 grams
or more of methamphetamine, including adulterants and dilutants, with intent to
deliver.  In two issues, appellant
complains that the trial court erred by denying his motion to suppress evidence
obtained from an illegally prolonged stop and search and by admitting a
statement from appellant=s juvenile
son in violation of appellant=s confrontation rights.  We
affirm. 

II.  Background Facts

A confidential informant told
Fort Worth Police Department officers that appellant had a large cache of
methamphetamine ice in his home.  On
April 18, 2005, narcotics investigators set up surveillance at the home and
arranged for the informant to use a middleman to order a pound of
methamphetamine ice from someone at the home. 
After the informant contacted the middleman to order the
methamphetamine, the officers saw appellant walk outside with a brown paper
sack containing a heavy object. 
Appellant placed the brown sack in the rear floorboard of an Oldsmobile
and then got into the driver=s seat.  Another man got into
the front passenger=s seat, and
appellant=s teenage
son, C.D., got into the rear driver=s side passenger seat. 








Detective Eric Martinez, one
of the narcotics officers, attempted to follow appellant as he drove away but
lost sight of the Oldsmobile on Interstate 35. 
Detective Bruce Blaisdell, who was following appellant in a different
vehicle, saw appellant change lanes without using a turn signal and noticed
that none of the passengers were wearing their seatbelts.  Later, when Officer Nathan Holsey spotted the
Oldsmobile, Detective Blaisdell ordered him to stop the car based on the
observed traffic violations.  Instead of
pulling over immediately after Officer Holsey turned on his lights and sirens,
appellant continued to drive for several blocks. 

At the same time that Officer Holsey was trying to stop appellant on
the interstate, officers at appellant=s home saw a Ford Explorer in the driveway.   One officer saw an individual place what
appeared to be a cooler in the back of the Explorer and then drive down the
street and pick up a person who was standing on the street and talking on a
cell phone.  The officers later
determined that appellant had a cell phone in his shirt pocket, and they believed
that appellant had called someone at the house. 

When appellant pulled over to the shoulder of the road, Officer Holsey
approached and asked for his driver=s license and proof of insurance. 
Appellant possessed neither, so Officer Holsey arrested him, conducted a
pat down search, and placed him in the back seat of the patrol car.  Officer Holsey found no weapons or
drugs.  

Meanwhile, several other police officers, including Detectives
Martinez and Blaisdell, had parked their vehicles on the access road below the
interstate; Detective Martinez began walking up the concrete ramp between his
car and the Oldsmobile approximately two to three minutes after appellant
pulled over.  Detective Martinez saw
Officer Holsey return to the Oldsmobile and ask C.D. and the other adult male
passenger to step out. 








Officer Holsey first frisked C.D.; C.D. stepped out of the Oldsmobile,
walked to the trunk, bent over, and placed his hands on the trunk.  Officer Holsey, who faced C.D.=s back the entire time, conducted a quick frisk for cell phones and
weapons.  Finding no cell phones or
weapons on C.D. or the other adult male passenger, Officer Holsey instructed
them to stand by a guardrail near the Oldsmobile.  Although Officer Holsey had faced C.D.=s back throughout the entire frisk, Detective Martinez, who was still
walking up the service ramp, faced C.D.=s front and noticed a suspicious bulge in C.D.=s waistband.  Fearing the bulge
might be a weapon, Detective Martinez immediately approached C.D. at the
guardrail and asked him what was in his pants. 
C.D., who was not under arrest or handcuffed, started crying and said
that he did not know what it was but that appellant had given it to him to
hide.  Detective Martinez asked C.D. to
remove the item in his pants; C.D. pulled out a clear plastic bag.








Officers later determined that the plastic bag contained more than 440
grams of methamphetamine ice.  As a
result, Detective Martinez arrested appellant and C.D.  At the same time that Detective Martinez
approached C.D. and found the drugs, other plainclothes officers approached the
scene, questioned appellant, and searched the car, where they found no further
evidence of drugs.[1]  Detective Martinez told an officer to detain
C.D. and then walked over to question appellant.  Appellant consented to a search of his
residence, which produced no drugs.

Appellant=s bench
trial began on March 2, 2006, and lasted three days.[2]  The trial court denied appellant=s motion to suppress evidence obtained from the stop and search and
overruled appellant=s objections
to testimony regarding C.D.=s statements during the arrest. 
After making findings of fact and conclusions of law on the record, the
trial court found appellant guilty of intentionally or knowingly possessing
methamphetamine of more than 400 grams with intent to deliver and sentenced him
to twenty-five years=
incarceration. 

III.  The Stop and Search








In his first issue, appellant argues that the trial court erred by
denying his motion to suppress because the stop and search occurred over an Aillegally extended@ period of time Abeyond the
scope and justification for the charges related to the initial stop@; thus, the officers obtained evidence they should not have
obtained.  According to appellant,
because the stop and search violated his Fourth Amendment right against illegal
searches and seizures, the drugs and C.D.=s statements should have been suppressed.[3]


A.  Standard of Review








We review a trial court=s ruling on a motion to suppress evidence under a bifurcated standard
of review.  Carmouche v. State, 10
S.W.3d 323, 327 (Tex. Crim. App. 2000); Guzman v. State, 955 S.W.2d 85,
89 (Tex. Crim. App. 1997).  In reviewing
the trial court=s decision,
we do not engage in our own factual review. 
Romero v. State, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990); Best
v. State, 118 S.W.3d 857, 861 (Tex. App.CFort Worth 2003, no pet.).  The
trial judge is the sole trier of fact and judge of the credibility of the
witnesses and the weight to be given their testimony.  State v. Ross, 32 S.W.3d 853, 855
(Tex. Crim. App. 2000); State v. Ballard, 987 S.W.2d 889, 891 (Tex.
Crim. App. 1999).  Therefore, we give
almost total deference to the trial court=s rulings on (1) questions of historical fact, even if the trial court=s determination of those facts was not based on an evaluation of
credibility and demeanor, and (2) application‑of‑law‑to‑fact
questions that turn on an evaluation of credibility and demeanor.  Montanez v. State, 195 S.W.3d 101,
108-09 (Tex. Crim. App. 2006); Johnson v. State, 68 S.W.3d 644, 652‑53
(Tex. Crim. App. 2002); State v. Ballman, 157 S.W.3d 65, 68 (Tex. App.CFort Worth 2004, pet. ref=d).  But when the trial court=s rulings do not turn on the credibility and demeanor of the
witnesses, we review de novo a trial court=s rulings on mixed questions of law and fact.  Estrada v. State, 154 S.W.3d 604, 607
(Tex. Crim. App. 2005); Johnson, 68 S.W.3d at 652‑53.

Stated another way, when reviewing the trial court=s ruling on a motion to suppress, we must view the evidence in the
light most favorable to the trial court=s ruling.  Kelly v. State,
204 S.W.3d 808, 818 (Tex. Crim. App. 2006). 
When the trial court makes explicit fact findings, we determine whether
the evidence, when viewed in the light most favorable to the trial court=s ruling, supports those fact findings.  Id. at 818-19.  We then review the trial court=s legal ruling de novo unless its explicit fact findings that are
supported by the record are also dispositive of the legal ruling.  Id. at 819.








When the record is silent on the reasons for the trial court=s ruling, or when there are no explicit fact findings and neither
party timely requested findings and conclusions from the trial court, we imply
the necessary fact findings that would support the trial court=s ruling if the evidence, viewed in the light most favorable to the
trial court=s ruling,
supports those findings.  Id.  We then review the trial court=s legal ruling de novo unless the implied fact findings supported by
the record are also dispositive of the legal ruling.  Id.

We must uphold the trial court=s ruling if it is supported by the record and correct under any theory
of law applicable to the case even if the trial court gave the wrong reason for
its ruling.  Armendariz v. State,
123 S.W.3d 401, 404 (Tex. Crim. App. 2003), cert. denied, 541 U.S. 974 (2004);
Ross, 32 S.W.3d at 856; Romero, 800 S.W.2d at 543.  

B.  Standing

Before addressing whether appellant=s Fourth Amendment rights were violated by the continued detention, we
must first assess whether he has standing to complain about the seizure of the
methamphetamine ice.   Appellant has
standing to contest the search only if he had a reasonable expectation of
privacy in the area or item searched.  See
Kothe v. State, 152 S.W.3d 54, 59 (Tex. Crim. App. 2004).  

 








Proof of Aa reasonable
expectation of privacy@ is at the
forefront of all Fourth Amendment claims. 
See id.  Any defendant
seeking to suppress evidence obtained in violation of the Fourth Amendment must
first show that he personally had a reasonable expectation of privacy that the
government invaded.  Id.[4]  He must prove that he was a Avictim@ of the
unlawful search or seizure.  Id.  A defendant has no standing to complain about
the invasion of someone else=s personal rights.  Id.  Only after a defendant has established his
standing to complain may a court consider whether he has suffered a substantive
Fourth Amendment violation.  Id.  In addressing standing, it is critical to
identify the precise police conduct being objected to, for this may itself turn
out to be determinative on the standing issue. 
Id.  








The trial court ruled that C.D.=s statement and the methamphetamine ice seized from C.D. were
admissible because appellant had no privacy interest in his son=s pants and because the stop of the Oldsmobile was justified.  Although we agree appellant has no standing
to complain about any search and seizure of C.D., that issue is transcended by
appellant=s complaint
that the search and seizure were the result of an illegally prolonged detention
as discussed more thoroughly below.  See
id. 

The trial court was correct in concluding that appellant had no
standing to challenge the search of C.D.=s pants.  It is undisputed that
the police found over 440 grams of methamphetamine ice in C.D.=s pants, and not on appellant=s person, in the Oldsmobile, or at appellant=s residence.  It is also
undisputed that C.D. told Detective Martinez that appellant gave him the drugs
to hold and hide.  The issue, then, is
whether appellant can assert a right to privacy in the search of his juvenile
son=s body or in his son=s statements.  In this case, the
State contends that appellant lacks standing to complain about the
admissibility of the drugs because appellant had no reasonable expectation of
privacy regarding his son=s
pants.  True enough.  See id. (holding that a defendant
driver had no standing to complain about the search of a passenger=s bra after police found two balloons containing heroin).  Appellant cannot complain about a search of
C.D.  See id.  But that is not the basis of his
complaint.  








Rather, appellant=s Fourth Amendment claim is based upon a purportedly prolonged
detention of himself as the driver of the car. 
Appellant argues that, although the initial stop for violating traffic
laws was justified, once Officer Holsey arrested him for not having a license
or registration, any further detention of him violated the Fourth
Amendment.  He claims that the later
removal of C.D. from the car and search of his person were made by exploiting
the extended detention and are therefore Afruits of the poisonous tree.@  See id. (citing Wong
Sun v. United States, 371 U.S. 471, 488, 83 S. Ct. 407, 417 (1963)).

The testimony in this case establishes that both appellant and C.D.
had a reasonable expectation of privacy in the right to be free from an illegal
detention.  See id. at 61.  The intrusion a vehicle stop causes is
personal to those in the car when it occurs. 
Id.[5]  








Both appellant and C.D. had a Fourth Amendment right to not be
detained beyond the time necessary for Officer Holsey to complete his
investigation.  See id.  Thus, appellant has standing to complain about
any illegally prolonged detention.  If
the officers= conduct in
removing C.D. from the Oldsmobile and searching him was Aunreasonable@ under the
Fourth Amendment, appellant has standing to complain about the subsequent
search of C.D.  See id.  That search is Afruit of the poisonous tree@ if it constituted an exploitation of the illegal detention.  Id.

We turn, then, to the question of whether Officer Holsey=s conduct in removing C.D. from the Oldsmobile and searching him was Aunreasonable@ under the
Fourth Amendment.

C.  AReasonableness@ of Detention under the Fourth Amendment








On appeal, the question of whether a specific search or seizure is Areasonable@ under the
Fourth Amendment as applied to the historical facts found by the trial court is
subject to de novo review.  Id.; State v. Johnson, 896 S.W.2d 277,
285 (Tex. App.CHouston [1st Dist.] 1995), aff'd,
939 S.W.2d 586 (Tex. Crim. App. 1996).  In assessing this legal issue, courts give
almost total deference to the trial court=s findings of historical fact.  Kothe,
152 S.W.3d at 60; Johnson, 896 S.W.2d at 285.  However, questions involving
legal principles and the application of law to established facts are properly
reviewed de novo.  Kothe, 152
S.W.3d at 60; Johnson, 896 S.W.2d at 285.  Thus, in deciding whether
appellant=s continued
detention after his arrest was Areasonable@ under the
specific circumstances, we view the trial court=s factual findings in the light most favorable to his ruling, but we
decide the issue of Areasonableness@ as a question of Fourth Amendment law under Supreme Court
precedent.  Kothe, 152 S.W.3d at
63.

The Supreme Court states that Fourth Amendment Areasonableness@ is measured
Ain objective terms by examining the totality of the circumstances@; it Aeschew[s]
bright‑line rules, instead emphasizing the fact‑specific nature of
the . . . inquiry.@  Ohio v. Robinette, 519 U.S. 33, 39,
117 S. Ct. 417, 421 (1996).  It requires
a balance between the public interest served and the individual=s right to be free from arbitrary detentions and intrusions.  See Pennsylvania v. Mimms, 434 U.S. 106,
109, 98 S. Ct. 330, 332 (1977).








Routine traffic stops are analogous to investigative detentions and
are governed by Terry v. Ohio.  Gansky
v. State, 180 S.W.3d 240, 242-43 (Tex. App.CFort Worth 2005, pet. ref=d); see Berkemer v. McCarty, 468 U.S. 420, 436, 104 S. Ct.
3138, 3148 (1984) (noting traffic stop Asignificantly curtails the >freedom of action= of the driver and the passengers@ alike); Terry v. Ohio, 392 U.S. 1, 29-30, 88 S. Ct. 1868, 1884
(1968).  A Terry
analysis has two prongs.  Terry, 392 U.S. at 29-30, 88 S. Ct. at 1884.  A court must first decide
whether the officer=s action was
justified at its inception.  Id.  Here, neither party questions the validity of
the initial stop or appellant=s custodial arrest for not having a driver=s license or proof of insurance. 
Therefore, the trial court focused on the second prong of TerryCwhether the search and seizure of C.D. was reasonably related, in
scope, to the circumstances that justified the stop in the first place.

In deciding whether the scope of a Terry detention is Areasonable,@ the general
rule is that an investigative stop can last no longer than necessary to effect
the purpose of the stop.  See id.  The Supreme Court has held that an officer
who makes a lawful custodial arrest of the occupant of an automobile may, as a
contemporaneous incident of the arrest, search the passenger compartment of the automobile.
 New York v. Belton, 453 U.S. 454,
460, 101 S. Ct. 2860, 2864 (1981).  Thus, when a driver violates a traffic law and is subsequently
arrested, the extended period of time necessary to search the driver=s car is reasonable.  See
id.  Here, Officer Holsey was
justified in detaining appellant after the arrest and by removing C.D. and the
other passenger from the Oldsmobile so that he could search it.   








Terry also authorizes a
pat-down search of a person for weapons when the officer is justified in
believing that the detainee may be armed and presently dangerous.  Terry, 392 U.S. at 29-30, 88 S. Ct. at
1884.  The purpose of a Terry
search is to neutralize a potentially volatile situation and allow an officer
to investigate without fear of violence; it is not meant to discover evidence
of a crime.  See id.; Wood v. State,
515 S.W.2d 300, 306 (Tex. Crim. App. 1974). 
This does not mean that the officer must be absolutely certain that the
individual is armed; nor does the officer have to have probable cause to arrest.
 Davis v. State, 61 S.W.3d 94, 97
(Tex. App.CAmarillo 2001, no pet.).  Rather, the issue is whether a reasonably
prudent officer in the same circumstances would be warranted in believing that
his safety or that of others is in danger.  See Carmouche, 10 S.W.3d at 329 (stating
that the officer must have before him specific and articulable facts reasonably
leading him to conclude that the suspect might possess a weapon).  Moreover,
that weapons and violence are associated
with the drug trade is rather settled.  Id. at 330.  Thus, encountering one who is reasonably
suspected of engaging in drug activity
can justify a brief and minimally intrusive frisk of his person.  Id.








In this case, the trial court concluded that the traffic stop and
custodial arrest were legal based upon Areasonable suspicion and probable cause for not maintaining, having, a
license or insurance.@  The trial court also concluded that the
prolonged detention and search of C.D., the other passenger, and the car were
reasonable Abased on the
information, based on the suspicion of drug activity.@  The trial court noted that Ait was not unreasonable to frisk a person pursuant to [a] Terry stop,
which is all that was involved with the son.@  The trial court concluded that
none of appellant=s Fourth,
Fifth, Ninth, or Fourteenth Amendment rights under the U.S. Constitution were
violated, nor were his rights under the Texas Constitution violated.  We agree as to the Fourth Amendment ground
only.

Officer Holsey was
justified in frisking C.D. after removing him from the car because he had
articulable facts indicating that C.D. may have had a weapon.  See id. at 329.  Specifically, Detective Blaisdell, an
undercover narcotics investigator, had watched appellant transport a brown
paper sack with a heavy object from his house to his car after the officer
arranged for an informant to order a pound of methamphetamine ice from someone
in appellant=s house. 
After following appellant and observing several traffic law violations,
Detective Blaisdell called Officer Holsey and told him to stop the Oldsmobile,
ticket the driver for violating traffic laws, and pat down everyone in the car
for weapons and cell phones.  Detective
Martinez was also justified in asking C.D. about the bulge in his pants because
the search of the Oldsmobile had not been completed, the detective knew that
C.D. had been riding with appellantCa suspected
methamphetamine ice dealerCon the way to a
possible drug deal, and the detective noticed that Officer Holsey had not seen
or felt the bulge during his frisk of C.D. 
Thus, the officers were justified in believing that a weapons search was
necessary for their safety.  See id. at 330.

 








Viewing the totality of the circumstances in the light most favorable
to the trial court=s factual
findings, the officers= removal of
C.D. from the car and subsequent frisk of his person were not illegally
prolonged and were Areasonable@ as a matter of substantive Fourth Amendment law.  See Robinette, 519 U.S. at 39, 117 S.
Ct. at 421.  Accordingly, we overrule
appellant=s first
issue.  

IV.  C.D.=s Statement

The trial court held that C.D.=s statement that appellant gave him the drugs to hide was admissible
because it was nontestimonial and, therefore, not subject to exclusion under
the Sixth Amendment.  In his second
issue, appellant asserts that the statement was testimonial, and the trial
court=s ruling was error because it violated his Sixth Amendment
confrontation right under Crawford. 
See Crawford v. Washington, 541 U.S. 36, 124 S. Ct. 1354
(2004).  The State asserts that because
Detective Martinez=s questions
were motivated by a concern for officer safety and because C.D. lacked the
capacity to appreciate the legal consequences of his response, the response was
nontestimonial and, therefore, admissible despite C.D.=s absence.[6]  See id. 








A.  Standard of Review and
Applicable Law

In Crawford, the Supreme Court held that the admission of a
hearsay statement made by a nontestifying declarant violates the Sixth
Amendment if the statement was testimonial when made and the defendant lacked a
prior opportunity for cross-examination. 
541 U.S. at 68, 124 S. Ct. at 1374. 
Thus, a Atestimonial@ statement is inadmissible absent a showing that the declarant is
presently unavailable and the defendant had a prior opportunity for
cross-examination, even if the statement falls under a firmly rooted hearsay
exception such as the excited utterance exception or bears particularized
guarantees of trustworthiness.  Id.
at 58-60, 68, 124 S. Ct. at 1368-69, 1374. 
Although the Crawford opinion does not provide a comprehensive
definition of Atestimonial,@ it does indicate that the term covers ex parte in-court testimony or
its functional equivalent, extrajudicial statements contained in formalized
testimonial materials such as prior testimony at a preliminary hearing, before
a grand jury, or at former trial, and police interrogations.  Walter v. State, 209 S.W.3d 722, 728 (Tex.
App.CTexarkana 2006, pet. granted) (citing Crawford, 541 U.S. at 52,
124 S. Ct. at 1364). 








In Wall v. State, the Texas Court of Criminal Appeals concluded
that the testimonial character of a statement is determined by the declarant=s ability to appreciate the legal ramifications of his statement.  184 S.W.3d 730, 742 (Tex. Crim. App.
2006).  Subsequent to Wall, the
Supreme Court provided further guidance regarding statements that are
considered Atestimonial@ for purposes of Crawford. 
See Davis v. Washington, 126 S. Ct. 2266, 2273-74 (2006).  The question in Davis was Awhether, objectively considered, the interrogation that took place in
the course of the 911 call produced testimonial statements.@  See id. at 2276.  The Court stated that the declarant=s statements were not testimonial because (1) she was describing
events as they were actually happening rather than past events, (2) any reasonable
listener would recognize that the declarant was facing an ongoing emergency,
(3) the nature of what was asked and answered, when viewed objectively, was
such that elicited statements were necessary to be able to resolve the present
emergency, rather than simply to learn what had happened in the past, and (4)
the declarant was frantically answering the 911 emergency operator=s questions over the phone, in an environment that was not
tranquil.  Id. at 2276-77; Vinson
v. State, 221 S.W.3d 256, 263 (Tex. App.CHouston [1st Dist.] 2006, pet. granted); Rangel v. State, 199
S.W.3d 523, 534 (Tex. App.CFort Worth 2006, pet. granted) (op. on PDR).    








The Davis Court cautioned, however, that Aa conversation which begins as an interrogation to determine the need
for emergency assistance@ can evolve
into testimonial statements Aonce that purpose has been achieved.@  Davis, 126 S. Ct. at
2277.  In contrast to its holding
regarding the 911 conversation, the Court held that the at-the-scene
statements were testimonial.  Id. at
2278.  In support of this second holding,
the Court reasoned that

[i]t is entirely clear from the
circumstances that the interrogation was part of an investigation into possibly
criminal past conduct . . . . There was no emergency in progress; the
interrogating officer testified that he had heard no arguments or crashing and
saw no one throw or break anything . . . . When the officers first arrived,
[the complainant] told them that things were fine . . . ., and there was no
immediate threat to her person. When the officer questioned [her] for the
second time, and elicited the challenged statements, he was not seeking to
determine . . . . Awhat is happening,@ but rather Awhat happened.@ 
Objectively viewed, the primary, if not indeed the sole, purpose of the
interrogation was to investigate a possible crime. 

Id. 

 

Likening the statement before it to
that in Crawford, the Court noted: 

Both
declarants were actively separated from the defendant. . . . Both statements
deliberately recounted, in response to police questioning, how potentially
criminal past events began and progressed. And both took place some time after
the events described were over.  Such
statements under official interrogation are an obvious substitute for live
testimony, because they do precisely what a witness does on direct
examination; they are inherently testimonial.

Id. 
(emphasis in original).  

 








So, from Davis, we learn that
there are at least four factors we may consider when determining whether a
statement is testimonial or not, and the timing, purpose, and setting of the
statement can be relevant considerations. 
See Vinson, 221 S.W.3d at 263 (holding that a declarant=s statement that her boyfriend had assaulted her was nontestimonial
where declarant had been screaming for help on 911 call and appeared injured
when police entered her apartment and asked her Awhat happened@); Walter,
209 S.W.3d at 728 (holding that co-conspirator=s remarks in private conversation with his brother hours after murders
were not testimonial statements because the conversation involved only the two
brothers, took place at co-conspirator=s residence, and co-conspirator spoke nervously in an attempt to avoid
being connected to the crimes); Rangel, 199 S.W.3d at 534 (holding that
a declarant=s statements
were testimonial because they were made two months after the emergency).         The
holding in Davis also reveals that statements are nontestimonial when
made in the course of police interrogation under circumstances that objectively
indicate that the primary purpose of the interrogation is to enable police to
meet an ongoing emergency.  See Grant
v. State, 218 S.W.3d 225, 231 (Tex. App.CHouston [14th Dist.] 2007, pet. ref=d); Cook v. State, 199 S.W.3d 495, 497 (Tex. App.CHouston [1st Dist.] 2006, no pet.). 
Conversely, they are testimonial when the circumstances objectively
indicate that there is no such ongoing emergency, and the primary purpose of
the interrogation is to establish or prove past events potentially relevant to later
criminal prosecution.  See Grant,
218 S.W.3d at 231; Cook, 199 S.W.3d at 497.

 








Consistent with this holding, in
determining whether statements are testimonial, Texas courts generally have
looked to the degree of formality of a declarant=s interaction with police, the purpose and structure of police
questioning, and the likelihood that the declarant expects that the statements
could be used in a criminal prosecution. 
Cook, 199 S.W.3d at 497; see Spencer v. State, 162 S.W.3d
877, 879 (Tex. App.CHouston
[14th Dist.] 2005, pet. ref=d).  A witness=s responses to preliminary questions by police officers at the scene
of a crime while assessing and securing the scene are not
testimonial.  See De La Cueva v. State,
No. 14-05-01115-CR, 2006 WL 3589482, at *3 (Tex. App.CHouston [14th Dist.] Dec. 12, 2006, pet. ref=d) (not designated for publication); Spencer, 162 S.W.3d at
879.  








In De La Cueva, two police
officers reported to a Walgreen=s parking lot after receiving calls about a fight.  De La Cueva, 2006 WL 3589482, at *3.  The officer found the victim-witness lying
face down, crying, and bleeding from her face. 
See id.  The officers asked
the victim who hurt her, and she pointed at the defendant and said, Ahe had kicked her in the face.@  Id.  The trial court used the analysis in Davis
to determine that the officer=s question was Afor the
purpose of determining the extent of [the victim=s] injuries and gathering information for dispatch.@  Id.  AThey were trying to provide >assistance to meet an ongoing emergency=@ and were securing the scene.  See
id.; Marc v. State, 166 S.W.3d 767, 779 (Tex. App.CFort Worth 2005, pet. ref=d) (noting that a police officer=s motivations during the officer=s preliminary questions are relevant when determining whether the
witness=s responses are testimonial). 

We defer to a trial court=s determination of historical facts and credibility, but we review a
constitutional legal ruling, i.e. whether a statement is testimonial or
nontestimonial, de novo.  See Wall,
184 S.W.3d at 742.      

B. 
Analysis








First, appellant admitted to Detective
Martinez that he gave C.D. the methamphetamine ice; however, he said that it
was not his.  This statement was admitted
into evidence without objection.  To
preserve error, a party must continue to object each time the objectionable
evidence is offered.  Fuentes v. State,
991 S.W.2d 267, 273 (Tex. Crim. App.), cert. denied, 528 U.S. 1026
(1999); Ethington v. State, 819 S.W.2d 854, 858-59 (Tex. Crim. App.
1991).  A trial court=s erroneous admission of evidence will not require reversal when other
such evidence was received without objection, either before or after the
complained-of ruling.  Leday v. State,
983 S.W.2d 713, 718 (Tex. Crim. App. 1998); Johnson v. State, 803
S.W.2d 272, 291 (Tex. Crim. App. 1990), cert. denied, 501 U.S. 1259
(1991), overruled on other grounds by Heitman v. State, 815 S.W.2d 681
(Tex. Crim. App. 1991).  This rule
applies whether the other evidence was introduced by the defendant or the
State.  Leday, 983 S.W.2d at
718.  Because Detective Martinez=s testimony regarding appellant=s statement that Ahe did give his son the methamphetamine@ was admitted without objection, we must only determine whether the
rest of C.D.=s statement
to Detective Martinez that appellant gave him the drugs to hide violated
Crawford.  See Fuentes, 991
S.W.2d at 273. 

Detective Martinez asked C.D. several
questions at the scene.  However, the
trial court only admitted into evidence the officer=s first questionCthe inquiry
about the bulge in C.D.=s pantsCand C.D.=s first
response, that he did not know what it was, but that appellant had given it to
him to hide.[7]  








Both parties agree that C.D.=s response here was an excited utterance and therefore admissible as
an exception to the hearsay rule.  Tex. R. Evid. 803(2); Zuliani v.
State, 97 S.W.3d 589, 595 (Tex. Crim. App. 2003).  Therefore, our analysis will center on
whether the statement was testimonial in nature.  See Wall, 184 S.W.3d at 742 (holding
that a statement that qualifies as an excited utterance can still be
testimonial in nature, and a reviewing court must inquire whether such a
statement violates a defendant=s right to confrontation).

The narcotics detectives had instructed
Officer Holsey to frisk the front-seat passenger and C.D. for weapons and cell
phones.  Therefore, after he arrested
appellant and placed him in the patrol car, Officer Holsey walked back to the
Oldsmobile.[8]  He then asked C.D., who was sitting in the
driver=s side back seat, to step out of the car.  C.D. stepped out with his back to Officer
Holsey and was bent over the Oldsmobile=s trunk during the brief frisk. 








Detective Martinez walked up the service
ramp and towards the Oldsmobile just as Officer Holsey was patting C.D. down;
because C.D. was facing him (and facing away from Officer Holsey), he noticed a
suspicious bulge in C.D.=s
pants.  Officer Holsey told C.D. to stand
at the guard rail.  Neither C.D. nor the
other passenger were handcuffed at this point. 
Detective Martinez, concerned that Officer Holsey did not see the bulge
and that C.D. might have a weapon hidden there, approached C.D. and the other
male passenger at the guardrail and asked C.D. what was in his pants.  C.D. immediately started crying, looked at
the patrol car where appellant was sitting, and responded that he did not know
what it was and that appellant had given it to him to hide.  Detective Martinez told C.D. to pull it out,
and C.D. removed the plastic bag of drugs from his pants.








It is
important to note that Detective Martinez did not ask appellant or the adult
passenger any questions and did not inspect the interior or the trunk of the
Oldsmobile for drugs before approaching C.D.[9]  Thus, when Detective Martinez arrived, his first
priority was to secure the scene by ensuring that Officer Holsey had not
missed identifying a possible weapon hidden in C.D.=s pants.[10]  See Davis, 126 S. Ct. at 2274 (holding
that courts should consider whether the Aprimary purpose@ of the
officer=s questioning was Ato establish or prove past events potentially relevant to later
criminal prosecution@); De La
Cueva, 2006 WL 3589482, at *3 (noting that an officer=s need to meet an ongoing emergency is a relevant consideration in the
Crawford analysis); Marc, 166 S.W.3d at 779 (same).

Detective
Martinez=s testimony at trial supports this conclusion:

[The State]: And you thought
what was in theCwhat
did you think was in the teenager=s pants when you asked that
question?

 

[Martinez]:  A weapon.

 

[The State]:  When you asked
that question, did you ever have any intention of getting information from this
teenage son that you would use for testimony?

 

[Martinez]:  No, sir.

 

[The State]:  What were you
concerned about?

 

[Martinez]:  A weapon.

 

[The State]:  And getting shot?

 

[Martinez]:  Yes, sir.

 








The evidence
at trial established that Detective Martinez walked up to the scene of a crime
where a suspected drug dealer had just been arrested.  Detective Martinez saw Officer Holsey miss
the possible weapon in C.D.=s pants during the frisk and then saw Officer Holsey direct C.D. and
the other male passenger, who were not handcuffed or otherwise secured, to the
guardrail.  When viewed objectively, because
the officers were potentially in danger, Detective Martinez=s  preliminary question was
motivated by a need to secure the scene, and C.D.=s initial answer was in response to the officer=s attempt to secure the scene and to resolve a potential
emergency.  See De La Cueva, 2006
WL 3589482, at *3; Vinson, 221 S.W.3d at 263; Rangel, 199 S.W.3d
at 534.  Thus, we conclude that C.D.=s initial statement was not the product of custodial police
interrogation, nor was it a response to tactically structured police
questioning.  See Davis, 126 S.
Ct. at 2273-74; Spencer, 162 S.W.3d at 879.  Therefore, we agree with the trial court that
C.D.=s statement that appellant had given him the bag to hide was
nontestimonial.  See Davis, 126
S. Ct. at 2273-74; Spencer, 162 S.W.3d at 879; Kearney v. State,
181 S.W.3d 438, 442 (Tex. App.CWaco 2005, pet. ref=d); Ruth v. State, 167 S.W.3d 560, 568-69 (Tex. App.CHouston [14th Dist.] 2005, pet. ref=d); Marc, 166 S.W.3d at 779.      








Because we
have determined that C.D.=s statement
was nontestimonial based on the lack of a police interrogation, we do not need
to address whether C.D. appreciated the consequences of the statement.  See Marc, 166 S.W.3d at 779 (declining
to address the declarant=s
appreciation of the consequences of his statement because the lack of a
custodial interrogation was sufficient to determine that the statement was
nontestimonial); Spencer, 162 S.W.3d at 880-83 (same).  Therefore, we hold that the trial court did
not err by concluding that C.D.=s first response was admissible and that appellant=s motion to suppress was correctly denied.  Accordingly, we overrule appellant=s second issue.  

V.  Conclusion

Having
overruled appellant=s two
issues, we affirm the trial court=s judgment. 

 

 

TERRIE
LIVINGSTON

JUSTICE

 

PANEL
B:   LIVINGSTON, WALKER, and MCCOY, JJ.

 

PUBLISH 

 

DELIVERED: July 19, 2007    

                                                    











[1]When
the officers questioned appellant about the other adult male passenger,
appellant told them that he was Ajust a guy I live with.@  Based on this information, the officers
decided not to put the man=s name in their report or
interview him.  Consequently, the record
is unclear regarding who the other adult male passenger was and to what extent
he may have been involved with the methamphetamine ice. 

 





[2]Appellant waived his right to a
jury trial.  





[3]In
his brief, appellant initially claims that the officers violated his rights
under the Fourth, Fifth, and Fourteenth Amendments of the United States
Constitution and his rights under article I, section 10 of the Texas
Constitution. However, appellant=s legal and factual analyses
focus exclusively on the alleged Fourth Amendment violation.  When briefing constitutional issues, a party
should separate federal and state issues into distinct points or issues and
provide substantive argument on each.  McCambridge v. State, 712 S.W.2d 499, 501
n.9 (Tex. Crim. App. 1986).  If a party
does not do this, we need not address federal and state constitutional issues
separately.  Eldridge v. State,
940 S.W.2d 646, 650 (Tex. Crim. App. 1996).  Because appellant failed to provide
substantive arguments for each constitutional claim, our analysis of his Fourth
Amendment complaint will dispose of all constitutional claims.





[4]See
Rakas v. Illinois, 439 U.S. 128, 139, 99 S. Ct. 421, 428 (1978)
(noting that issue of standing involves two inquiries:  first, whether defendant has alleged an Ainjury
in fact@; and
second, Awhether
the proponent is asserting his own legal rights and interests rather than
basing his claim for relief upon the rights of third parties@).  AFourth Amendment rights are
personal rights which, like some other constitutional rights, may not be
vicariously asserted.@ Alderman
v. United States, 394 U.S. 165, 174, 89 S. Ct. 961, 966-67 (1969).





[5]United
States v. Roberson, 6 F.3d 1088, 1091 & n.6 (5th Cir. 1993) (AWhereas
the search of an automobile does not implicate a passenger=s
fourth amendment rights, a stop results in the seizure of the passenger and
driver alike.  Thus, a passenger of a
stopped automobile does have standing to challenge the seizure as
unconstitutional.@); United
States v. Powell, 929 F.2d 1190, 1195 (7th Cir. 1991) (collecting cases and
concluding that passengers, as well as drivers, have standing to challenge a
vehicle stop or prolonged detention); see also United States v. Woodrum,
202 F.3d 1, 6 (1st Cir. 2000) (holding that Aeach occupant of a car has a
right to challenge the propriety of a traffic stop under the Fourth Amendment@).





[6]When
C.D. was released from juvenile custody, C.D. left the country and is currently
at large in Mexico; therefore, he was not called to testify at appellant=s
trial. 

 





[7]The trial court held that

 

under
the Crawford [sic] test, looking at the facts and the circumstances, the fact
that he was not under arrest, the fact that there wasn=t a formal interrogation, hadn=t completely developed, the excited
nature and state of what was going on, . . . [the statement] wasn=t testimonial.  It was quickly fixin= to become that way. . . . And I
find that [the exception ends after] the initial statements of, basically
paraphrased to the effect, of Amy dad gave it to me to hide.@ . . . . Once that information
develops, an interrogation begins.  Any
further statements I find are covered by Crawford [sic], but not the initial
statement.  

 





[8]The
officers found cell phones on appellant but Neither of the two passengers had a
cell phone. 





[9]In his brief, appellant asserts
that the officers completed their search of the interior and trunk of the
Oldsmobile and questioned appellant before asking C.D. about the suspicious
bulge in his pants.  Appellant provided
no citations to the record to support this claim, and after a careful review of
the record, we determine that appellant=s assertion here about the timeline of events is incorrect.


 





[10]While
at the scene of appellant=s
arrest, Detective Martinez saw the brown paper sack sitting on the floorboard
in the back of the Oldsmobile.  It is
unclear from the record whether Detective Martinez saw this sack before or
after questioning C.D. and whether he knew that the sack no longer contained
the plastic bag of drugs.